**Opinion filed March 10, 2011**



In The

# Eleventh Court of Appeals

—————

## No. 11-09-00247-CR

—————

### ALEX RICARDO SALDANA, Appellant

### V.

### STATE OF TEXAS, Appellee

**On Appeal from the 238th District Court**

**Midland County, Texas**

**Trial Court Cause No. CR35352**

### M E M O R A N D U M   O P I N I O N

This case involved the firing of a gun by appellant, Alex Ricardo Saldana, in the parking lot of a Whataburger in Midland early in the morning of November 16, 2008. Appellant was indicted for the murder of Stephen Adams and for aggravated assaults against Derek Raymond Schwartz, Gerald Sikorski, Corey Heflin, and William Russell Jr. The jury found appellant guilty of all counts and assessed a sentence of sixty years confinement for the murder and ten years confinement for each of the aggravated assaults. A $10,000 fine was assessed for each count.

On appeal, appellant argues in four issues that the trial court erred (1) in allowing the detective in charge of this case to give her opinion on appellant's mental state, (2) in denying

appellant's motion for change of venue, (3) in denying appellant's *Batson*[1] challenge, and (4) in failing to order a mistrial after a detective commented that appellant's clothing could be associated with a gang. We affirm.

*Background Facts*

Appellant and his girlfriend, Veronica Armendariz, drove into the parking lot of Whataburger and parked appellant's tan Ford Taurus near the entrance. While Armendariz was vomiting just outside the passenger side, appellant got out to urinate by the car. Derek Raymond Schwartz and Gerald Sikorski drove up in a blue Mazda with the car radio playing loudly. One or both made loud remarks to appellant to the effect that appellant should go inside to urinate. Appellant testified that the two men approached him in a threatening manner, but he acknowledged that neither had a weapon. Appellant showed them that he had a gun, a .40 caliber Glock. Appellant said that, to scare them, he fired one shot to the side that was aimed at the trunk of the Mazda. Schwartz and Sikorski retreated and went inside.

Appellant then backed his car up; Armendariz's window was rolled down. Although Schwartz and Sikorski testified that they were inside Whataburger at that point, appellant claimed that Schwartz ran toward the passenger side of appellant's car as he was starting to drive forward. Appellant testified that he then fired three shots to the side of Schwartz to keep him away. One of those shots killed Stephen Adams who was standing behind his pickup talking to Corey Heflin and William Russell Jr. Because the shots were being fired at them, Heflin and Russell hit the ground when Stephen Adams fell. Appellant drove off and was apprehended about fifteen minutes later at his home.

Tonya Tuck and her friend, Eden, were in the last vehicle in the drive-through line at the Whataburger. They heard a shot that came from near the entrance of the parking lot, and Tuck saw sparks from a gun held by a person standing by a gray or tan Ford Taurus. According to Tuck, the person then got back into the Ford Taurus. After the car had backed up, they heard four more shots, saw a man fall, and saw the Ford Taurus drive away. Tuck called 911 and gave the dispatcher the license number of the Ford Taurus. While she was still on the phone with the dispatcher, Tuck went over to try to help the victim with CPR. Tuck testified that she did not see anyone else with a weapon. She did not see anyone rush toward the Ford Taurus or do anything

---

[1]*Batson v. Kentucky*, 476 U.S. 79 (1986).

threatening to the shooter.  There were no shots from anyone else in the parking lot except the person in the Ford Taurus.

Judith Missy Adams, the next witness, testified that the victim, Stephen Adams, was her husband.  That night, she, Mr. Adams, and their daughter Kresha Darlene Adams had gone to The Hog Pit and then to The Ranch.  Because Kresha wanted to get something to eat, they went to the Whataburger before going home.  After they pulled into a parking space, Kresha went inside, but Mr. and Mrs. Adams stayed in the pickup.  Mrs. Adams said that something hit the back of the pickup that shook the whole pickup.  Mr. Adams got out to see what had hit their pickup.  He walked around to the back of the pickup.  Two men walked up, and Mrs. Adams said that they were laughing and talking.  Mrs. Adams then saw a car about to drive out the exit and saw a girl in the car with dark glasses facing her.  Suddenly, she heard four or five popping sounds, and all three men went down.  She walked to the back of the pickup, saw her husband, and knew he was gone.  Mrs. Adams tried to give him CPR and ended with having his blood all over her.  Mrs. Adams did not hear shots from anywhere other than from the small car.  She did not know appellant or Armendariz.

Kresha confirmed that she went inside to order.  As she opened the door after getting her food, she heard four gunshots.  She then saw her mother getting out of the pickup and  her father lying on the ground.  He was bleeding from the top of his head, and blood was coming from his mouth.  Kresha testified that, while she was waiting for her food, there was no big scuffle or commotion going on out in the parking lot.  Kresha also did not know appellant or Armendariz.

Schwartz testified that he and Sikorski had been at Woofers and Tweeters.  He was driving his blue Mazda.  When he got out of the car, Sikorski was talking to someone "across the parking lot."  Schwartz remembered hearing Sikorski say, "What's up?" as to a friend.  They were not trying to pick a fight.  According to Schwartz, the next thing he remembered was that the other fellow said, "I'm from D-Town," and Schwartz then saw something shining in his hand.  Schwartz said he turned and walked away.  Schwartz said that he could tell that the man was not happy.  He then heard a gunshot from behind him where the man was standing.  He and Sikorski went inside to use the restroom; they heard a few more shots while they were inside.

When they walked out, Schwartz saw the victim with blood everywhere, and he then saw a bullet hole in the trunk of his car.  Schwartz testified that he did not say anything to provoke a fight with appellant and that he did not have a weapon.  Schwartz did say that he felt threatened with bodily injury by appellant's gun.  Schwartz did not know appellant or Armendariz.

Sikorski testified that, as they pulled into the parking lot, he saw a man urinating next to his car. He told the man that he should go inside. Sikorski said that he had to scream at appellant because they had the music turned up very loud. Sikorski said that the man said, "What's up?" so they said, "What's up?" Then, appellant fired a gun at Sikorski. Sikorski saw the gun go off and felt something whiz by him. Sikorski is familiar with the muzzle flash and sound of a Glock; he said that the gun sounded like a Glock. The bullet hit the pickup that was beside Sikorski. Sikorski said he walked away to go inside to urinate. While he and Schwartz were in the restroom, they heard three more gunshots. When they went back outside, they heard a girl scream and saw a woman giving the victim chest compressions.

Sikorski testified that they did not hear gunshots come from anywhere other than from the man who had been urinating. He said that neither he nor Schwartz had any type of weapon. Sikorski also testified that he felt that he had been threatened with bodily injury. Sikorski admitted that he and Schwartz had spoken to the man, but said, "We weren't trying to be confrontational."

Corey Heflin, a student at Midland College, testified that he was sitting in his pickup waiting for friends to get their food inside when he heard a gunshot. He got out of his pickup to see what happened and met Mr. Adams and William Russell Jr. by the Adamses' pickup. He then heard the next gunshot, and Mr. Adams fell just in front of him. When he heard that second gunshot, he saw a man inside a tan Ford Taurus pointing a gun at them through the passenger window. When he saw Mr. Adams fall, Heflin dropped to the ground. He could tell that Mr. Adams was seriously injured.

Heflin testified that they had not said anything to the man in the Ford Taurus and that none of them had made any type of threatening or aggressive gesture toward the man. He also said that none of them had a weapon of any type. Heflin said that he did not know appellant or Armendariz. One of the shots hit Heflin's pickup, which was next to the Adamses' pickup. Heflin also testified that he felt threatened with bodily injury and that there had been no gunshots coming from anywhere other than from the Ford Taurus. Heflin said that he did not see anyone make a threat toward the occupants of the Ford Taurus, nor did he see anyone exhibit a weapon or fire a shot at the Ford Taurus.

William Russell Jr. testified that he had just come out of the Whataburger with his food. Russell, Heflin, and Mr. Adams were trying to figure out what was going on. The three were standing between the Adamses' red pickup and a tan pickup. Russell identified appellant at trial

4

as the same man in the parking lot who began shooting at them that night. Russell said that he could see both appellant and a girl in the Ford Taurus. Russell heard appellant say, "What [are] you looking at?" Russell said that they were looking at appellant trying to figure out what was going on when appellant began firing at them through the passenger window. Appellant was driving the Ford Taurus but shot through the passenger window. Because he was from a military family, Russell said that he knew it was a .40 caliber pistol from the sound. Russell thought that appellant fired six shots at them. When Mr. Adams and Heflin went down, Russell also ducked with them.

Russell said that he saw that Mr. Adams had been injured and that, after the Ford Taurus left, he went back inside to tell them that someone had been shot. Russell did not see anyone other than appellant with a gun that night. He did not hear shots from anywhere other than from the Ford Taurus. He did not hear any words exchanged between Mr. Adams or anyone else and appellant. None of the three men had weapons, and none had made any aggressive acts toward the people in the Ford Taurus. During cross-examination, Russell admitted that he had told an officer that night that appellant had been shooting wildly and that the bullet that hit Mr. Adams might have ricocheted. In his testimony at trial, however, he was clear that appellant had shot at them.

Lon Stuart Platt, a retired federal magistrate, resided near the Whataburger. He was awake at the time and heard a shot at 2:02 a.m. He then heard three more rounds go off fifty-four seconds later. He drove to the HEB across from Whataburger and parked because he feared that an officer might have been involved in a shooting. He saw a bullet hole in the fender of a pickup. After speaking with an officer, he left.

Patrol Officer Jesus Primera Robledo III of the Midland Police Department testified that he was the first officer to arrive at the scene. He saw a woman performing mouth-to-mouth resuscitation and a man doing chest compressions on a man who appeared to be dead. There was blood everywhere. The EMS arrived as Officer Robledo was getting his first aid kit from his patrol car. Officer Robledo found stainless steel .40 caliber Smith & Wesson casings and one brass .40 caliber casing by the entrance where the Ford Taurus had been. He also found a Glock magazine with hollow points in the parking lot. He remembered seeing two puddles, one by the fence where someone had parked and gotten out of their car and the other was vomit. At the time, he was looking at the scene with Melissa Nay of the Midland Police Department Identification Section.

Travis Skinner, another officer with the Midland Police Department, was dispatched to 3603 Louisiana, the address registered to the license plate number of the Ford Taurus. Three other officers – Sergeant Grimaldo, Officer Pizana, and Officer Truex – were on the scene when Officer Skinner arrived. Because no one was there, they parked their cars down the street. A few minutes later, a Ford Taurus pulled into the driveway, and the officers saw a male driver and a female passenger. The driver followed their commands to turn off the vehicle, drop the keys out the window, and show the officers his hands. When the driver got out, Officer Truex placed handcuffs on him. Officer Skinner identified appellant as the driver that night.

Officer Truex asked the driver that night if there were any firearms in the vehicle. Appellant first said, "No, there is not," but then he changed his answer. He said that there was one underneath the front seat. The officers found a .40 caliber Glock Model 27. State's Exhibit 45, a recording from Officer Skinner's in-car camera that was made that night at 3603 Louisiana, was then played for the jury. Officer Skinner said that he took appellant to the police department where appellant was interviewed by Detective Kay Therwhanger.

Sergeant Alfredo Grimaldo confirmed that he also was sent to 3603 Louisiana in Midland. The officers were about to leave when the Ford Taurus drove up. Sergeant Grimaldo said that there was a woman in the passenger seat and a child in the baby seat in the back. Detective Grimaldo confirmed that they found a .40 caliber Glock underneath the driver's seat. They also found a brass shell casing in the front driver's seat and a brass shell casing in the backseat area.

Detective Therwhanger first interviewed Armendariz, who said that she was not married to appellant but that he was the father of her two young children. Because Detective Therwhanger was not getting consistent stories from Armendariz, she went to the next room, gave *Miranda*[2] warnings to appellant, and interviewed him. Detective Therwhanger then went to the scene to talk with the officers there before returning to talk with appellant again. She looked at the scene, the physical evidence in the car and at the scene, the photographs, and the witnesses' statements. When Detective Therwhanger returned, she read appellant the *Miranda* warnings again and then recorded an interview with appellant. The interview was played for the jury.

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

When asked by the prosecutor what she did next, Detective Therwhanger said that she placed appellant under arrest for murder. When asked why, Detective Therwhanger testified, over objection, that she obtained a warrant because it was her "opinion he intentionally and knowingly shot his gun in the direction of at least four or five people, and hit one of them and killed him." Detective Therwhanger said that her opinion was based on the investigation at the scene, the physical evidence in the car, the physical evidence at the scene, statements of the witnesses, and what appellant had told her.

Detective Therwhanger testified that a .40 caliber shell casing was found near where appellant said that he parked his car. She said that the "throw-up" on the pavement in the parking lot was consistent with appellant's statement that Armendariz threw up outside the car. There was a blank spot where appellant's car was parked and next to it was fluid that looked like urine. There was a brass .40 caliber shell casing found next to where appellant parked. The location of that shell casing was too far away to be a casing from appellant's shots fired from in the car through the passenger window. Detective Therwhanger pointed out that the shell casings from his shots while driving the car would have discharged inside the car, and the officers found three spent .40 caliber shell casings in the Ford Taurus: one in the front seat and two in the backseat.

When asked what appellant was wearing that evening, Detective Therwhanger said that he was wearing a red, white, and blue striped shirt and dark-colored jeans that had red stitching of some sort on the pockets. The prosecutor then asked if the red stitching or that type of clothing had any significance. Detective Therwhanger replied, "[I]t was very flashy clothing. It could be associated with a gang." The defense objected, and the court instructed the jury to disregard the statement. The court overruled the defense's motion for a mistrial.

Detective Therwhanger testified that they performed gunshot residue tests on the hands of appellant, Armendariz, and Mr. Adams. They tested the hands of Mr. Adams because appellant had said that someone had shot at him. Detective Therwhanger noted that no other witness indicated that anyone was shooting a weapon except appellant.

Melissa Nay, an identification specialist for the Midland Police Department, testified that she was trained in crime scene processing and had taken pictures of the scene. She photographed Armendariz's hands and did gunshot residue tests on them. She also took a photograph of appellant's hands. There was a tattoo of a red star on one hand. The defense objected, arguing that the admission of that photograph would allow jurors to speculate about his possible gang

7

membership. The trial court overruled his objection. The defense also objected to the introduction into evidence of photographs of appellant when his clothes were collected. The prosecutor argued that it was important that the State be able to show that appellant had not been harmed in any way that night. The trial court overruled the objection, and Nay testified that the photographs showed that appellant did not have any injuries on his body. Photographs of the bullet that went through the trunk of the Mazda, through a speaker, and into the backseat were also introduced. Numerous photographs confirmed the testimony of the witnesses as to the damage to the various cars and pickups. There were two bullet holes in the victim's pickup.

David Clark, the identification section supervisor, confirmed that there was a Glock semiautomatic handgun and three spent .40 caliber casings inside the Taurus. The State then introduced the autopsy report from the medical examiner's office in Tarrant County and the gunshot residue results from the victim's hands. The report showed that there was no gunshot residue on Mr. Adams's hands.

Kelly Belcher, the Senior Trace Analyst with the Tarrant County Medical Examiner's Office, explained how she uses a scanning electron microscopy to analyze gunshot residue test samples. She testified that she found gunshot residue on the "right back hand" of appellant and on his "left back hand," indicating that appellant had shot a firearm. Armendariz also had gunshot residue on her hands, indicating that she had either shot a firearm or was in the vicinity of a discharging firearm. Belcher testified that there was no gunshot primer on the hands of the victim, Stephen Adams. The report prepared by her was introduced into evidence.

Jeffery Jerek Brown works for the Texas Department of Public Safety in the Firearm and Toolmark Section. His job is to determine whether a fired cartridge case or a fired bullet came from a particular firearm. He found that the four fired .40 caliber Smith & Wesson casings were fired from the Glock pistol. He also found that three of the four fired bullets were fired from the Glock. The fourth bullet, found in the Mazda, was not suitable for comparison.

Detective Therwhanger was recalled as a witness and asked about her statements in the recording of the statement by appellant. The prosecutor first noted that Detective Therwhanger had said to appellant that she knew he did not mean to intentionally shoot someone and that it might have been an accident or in self-defense. The prosecutor then asked Detective Therwhanger whether, when she said that, she believed that appellant had not intentionally shot the victim. Detective Therwhanger explained her statement was a tactic used in interrogations. Because of the evidence Detective Therwhanger had at that time, she believed that appellant was

not being truthful. At that point in the interrogation, appellant was not admitting to doing any of the shooting. Detective Therwhanger said that she did not believe the shooting was accidental or unintentional. The trial court overruled the defense objection that Detective Therwhanger's statement was an inappropriate opinion based on speculation.

Lauren Cotton is a caseworker with Child Protective Services. She was involved in an investigation of appellant as the parent of two children. Cotton testified that appellant brought up the subject of a murder that had occurred at the Whataburger. Appellant said that he was not intoxicated that night, that he and Armendariz were driving down Midkiff, and that someone in another vehicle had cut them off. He then pulled into the Whataburger parking lot. Armendariz was sick, stepped out, and vomited. Appellant said that he got out of the car and that three young men walked toward him talking "s--t" to him. He said that he pulled out a gun from the car and fired one shot in the air to scare them off. He and Armendariz got back in the car, and he rolled down her window in case she became sick again. After he backed out his car, he saw a car out the passenger window with four young men in it. Appellant said that he thought they were the same young men and that they were talking to him as before. Appellant described to Cotton how he reached across Armendariz and began to shoot at the other car.

Cotton testified that appellant did not ever say that anyone was shooting at him or that anyone had threatened him with a weapon. Nor did appellant tell her that anyone in a vehicle or black pickup shot at him. At the request of the prosecutor, the trial court said it would take judicial notice that the indictment was returned on November 25, 2008, and that Cotton's report was dated January 12, 2009. The State then rested.

Appellant testified on his own behalf. He and Armendariz were at Harry's Lounge for about two and one-half hours on the evening of November 15. He admitted drinking alcohol there, but added that no one stopped serving him. He and Armendariz left just before closing time, which was 2 a.m. They were going to pick up their children who were with Armendariz's mother. Armendariz became sick so he pulled into the very last parking spot, facing the fence, in the Whataburger parking lot. While Armendariz was vomiting, appellant went to the front of the car to relieve himself.

While he was relieving himself, a dark-colored Mazda came in honking and with music blasting. Appellant said that he was about to get in his car when the passenger in the Mazda got out and asked, "[W]hat the F was [he] doing?" Appellant said that he replied with the same statement. According to appellant, the two men began walking toward him and threatening him

9

verbally. Appellant reached under the driver's seat and pulled out a .40 caliber Glock. He fired one shot as a warning, just to show them that he was armed. Appellant testified that the men then ran around two vehicles in separate directions. He told Armendariz, "Let's go," and he rolled down her window in case she needed to throw up again. He then backed the car up.

Appellant testified that he was just about to drive forward when he heard yelling outside the passenger window and saw the driver of the Mazda running toward them. According to appellant, the driver yelled, "Do you want to F with us?" Appellant said that he told the driver, "I don't even know you. I told you I'm not from here. . . . I'm from D-Town."

Appellant said that he pulled out the Glock again and fired three rounds to the side of the driver to keep him away long enough for appellant to drive away. He claimed that he did not see three men standing behind a pickup because his focus was on the driver of the Mazda. He admitted again that he fired the three shots. After firing the shots, appellant went to pick up one of his children and then went straight home to 3603 Louisiana. Appellant claimed that, when he was picked up, he did not believe that he had shot anyone.

During cross-examination, appellant admitted that he had had "[a]t the most, six drinks" during the period between 11:30 p.m. and 2:00 a.m. at Harry's Lounge. Appellant admitted that he had lied to Detective Therwhanger when he told her that he pulled into the parking lot because someone in a black or white pickup had started shooting at him and that he had lied when he told her that someone had shot at him first and that he saw the black pickup again in the parking lot. In answer to the question, "So there was no black pickup. You made all of that up?" he answered, "Yes."

Appellant also admitted that, as Schwartz and Sikorski came toward him talking in a violent way, the two men did not hold any weapon toward him. They were just walking aggressively. Appellant said that he did not pay attention to their hands because he was retrieving his weapon from under the driver's seat. When asked whether the driver had a gun when he ran toward the passenger side later, appellant said that he did not know whether the driver was armed or not; he just felt threatened. He testified that he meant to just shoot the blue Mazda, but he admitted that he missed and that one bullet hit the side of the pickup that belonged to the Adamses. He also admitted that apparently another bullet from his gun killed Stephen Adams and the third bullet hit the pickup that belonged to Heflin.

The defense rested, and the prosecutor called Kristine Ford in rebuttal. Ford acknowledged that she had a conversation with appellant regarding guns. Appellant told Ford

that he was not a fighter.  Ford testified that appellant said that "he would rather just use his guns and get the occurrence over and done with, rather than fight."  The evidence was then closed.

After closing arguments, appellant was found guilty on all five counts.  The jury assessed punishment at sixty years confinement for the murder conviction and ten years each for the aggravated assault convictions.

*Appellant's Motion to Change Venue*

In appellant's second issue, he argues that the trial court erred when it denied his motion for change of venue.  Section 31.03(a)(1) of the Texas Code of Criminal Procedure provides that a change of venue may be granted if the defendant establishes that "there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial."  TEX. CODE CRIM. PROC. ANN. art. 31.03(a)(1) (Vernon 2006).  Appellant, however, had a heavy burden to prove the existence of such a prejudice in the community.  *Nethery v. State*, 692 S.W.2d 686, 694 (Tex. Crim. App. 1985).

A pretrial hearing on appellant's motion was held.  Appellant offered ten exhibits of publicity and affidavits by individuals in support of his motion.  Widespread publicity by itself is not considered inherently prejudicial.  *Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007); *Renteria v. State*, 206 S.W.3d 689, 709 (Tex. Crim. App. 2006).  Jurors do not have to be totally ignorant of the effects and issues of a particular case. *Renteria*, 206 S.W.3d at 709; *DeBlanc v. State*, 799 S.W.2d 701, 704-05 (Tex. Crim. App. 1990).  To prevail on a motion to change venue, a defendant must demonstrate that publicity about the case is pervasive, prejudicial, and inflammatory.  *Gonzalez*, 222 S.W.3d at 449; *Renteria*, 206 S.W.3d at 709.  On appeal, the standard of review is whether the trial court abused its discretion in refusing to grant the change of venue.  If the trial court's decision concerning a motion for a change of venue falls within the zone of reasonable disagreement, it will be upheld.  *Gonzalez*, 222 S.W.3d at 449.

The two primary means of discerning whether publicity is pervasive, prejudicial, and inflammatory are a hearing on the motion to change venue and the voir dire process.  *Id.*  The trial court in this case used both, deferring its decision until after voir dire.

In examining whether the pretrial publicity is prejudicial and inflammatory, a trial court may take three matters into consideration:  (1) the nature of the publicity, (2) any evidence presented at a change of venue hearing, and (3) testimony received from veniremembers at voir dire.  *Gonzalez*, 222 S.W.3d at 451.  News stories that are accurate and objective are generally considered not to be prejudicial or inflammatory.  *Id.*

11

The five newspaper articles and eight articles that appeared on mywesttexas.com introduced by appellant at the pretrial hearing were accurate and objective in their coverage. That coverage was not prejudicial or inflammatory. Appellant also introduced a number of adverse comments by readers that followed a story; all but one were dated between November 17 – 22, 2008. One blogger defended appellant. Appellant also introduced a number of affidavits from individuals asserting that appellant could not have a fair trial in Midland County. Appellant relied on *Harvey v. State*, 887 S.W.2d 174 (Tex. App.—Texarkana 1994, no pet.), to support his venue motion.

The facts in *Harvey* differed substantially from this case. There, a wife was charged with solicitation of her husband's murder in Titus County. Titus County had 9,359 households. The local newspaper had a circulation of over 4,400 of those households and ran several front page articles, banner headlines, other news stories, and letters to the editor regarding the case over a period of time of less than a year from the husband's murder to the beginning of the wife's trial. Rumors were spread that she practiced witchcraft, and the local police officials spoke openly with the press about the case. "[I]nformation coming from the sheriff's department was that they could not quite pin it down, but they thought it was the widow who had murdered him." *Harvey*, 887 S.W.2d at 177. Midland County has over 100,000 residents, and the State pointed out that fact to the trial court. The trial court took the matter under advisement until after voir dire.

At the outset of voir dire, the trial court informed the jurors that the trial involved a shooting at Whataburger and asked members of the panel to raise their hand if they had heard or read from any source a report that purported to be the facts of the case. The record is silent as to how many raised their hands. The court then asked if any of them had established an opinion as to appellant's guilt or innocence. Six of the seventy-six member venire panel raised their hands. After the State completed part of its voir dire, twelve (including the six) were challenged for cause and excused. Every member of the panel appears to have been asked if he or she had heard or read about the case. Many said they had. None were asked whether they had read the blogger opinions expressed in mywesttexas.com. Although a number of other potential jurors were challenged for cause and excused, the record reflects that only seven were challenged because they had formed an opinion of guilt or innocence based on what they had heard or read about the case.

Appellant emphasizes that the majority of the panel had heard about the case. As the court noted in *Gonzalez*, this fact is not sufficient to conclude that the entire community was "infected" by the pretrial publicity. *Gonzalez*, 222 S.W.3d at 450. More important is the consideration that the reporting was factual, and the trial court was within its discretion to believe the jurors' assurances that they had not formed an opinion on guilt or innocence. Appellant argues that the jurors were not candid because all of those who answered they had heard of the case had not raised their hands when the State began its voir dire. As we noted, the trial court at the very beginning asked the panel to raise their hands if they had heard or read about the case; however, the record is silent as to how many raised their hands.

The prosecutor also included in her question the important condition of whether any person, based on what they had heard or read, had already made up their mind or could not "base their decision strictly on what they hear in the courtroom." To answer the prosecutor's question, the juror had to have (a) heard or read about the case and (b) formed an opinion on guilt or innocence. Before the voir dire questioning was concluded, there was only one additional member who said that she had formed an opinion on guilt or innocence. The record does not show that there was a lack of candor.

Appellant refers to the State's explanation, in response to a *Batson* challenge, that it used a peremptory strike on Ms. Zuniga (a television station employee) because the State did not believe her statement that she did not remember much about the case. Appellant then argues that this example demonstrates that "the State agrees the media coverage affected the jurors' veracity." Even if the State were correct in its belief concerning Ms. Zuniga, which it may not have been, it does not follow from one example that the veracity of the entire panel should have been in question.

Appellant also argues that the affidavits filed by the State were insufficient to controvert the affidavits that he filed; therefore, the trial court should have granted his change of venue motion as a matter of law. In support, appellant cites *Turner v. State*, 641 S.W.2d 383 (Tex. App.—El Paso 1982, pet. ref'd). *Turner* was overruled by the Court of Criminal Appeals's opinion on the State's motion for rehearing in *Lundstrom v. State*, 742 S.W.2d 279, 286 (Tex. Crim. App. 1986). There the court concluded that the dissenting opinion on original submission was correct, and the court adopted it, affirming this court. The Court of Criminal Appeals held that controverting affidavits filed by the State are not limited to addressing only the credibility of the affiants supporting venue change or the adequacy of their basis of knowledge. Affidavits in

13

support of the State's position, as here, may generally deny that there exists so great a prejudice against the defendant or a dangerous combination against the defendant that he cannot expect a fair trial. *Lundstrom*, 742 S.W.2d at 286; *see* 42 George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice & Procedure* § 25.28 (2d ed. 2001). That is what the State did in this case. And the fact that all but seven of the seventy-six potential jurors stated that they remembered hearing something about the event, but had not formed an opinion, could be considered by the trial court in determining whether there was or was not so great a prejudice against appellant that he could not expect a fair trial.

The Texas Court of Criminal Appeals in the earlier case of *Henley v. State*, 576 S.W.2d 66, 72 (Tex. Crim. App. 1978), listed seven relevant factors for the trial court to consider in determining whether media attention affected the public. Even considering those factors, appellant did not meet his burden for a change of venue. The nature of the pretrial publicity in the newspapers and mywesttexas.com was objective. Government officials were asked about the event, but there is no evidence that they released any statements that were not accurate and objective. It did not appear from the record that very many people on the panel remembered much about the event by the time of the trial. Midland County, the area from which the jury was drawn, has a population of over 100,000. There were, no doubt, many events that vied for the attention of the populace between November and the following July.[3] There was no evidence of any factor that was likely to affect the candor or veracity of the prospective jurors.

The trial court did not abuse its discretion in overruling appellant's motion for change of venue. Appellant's second issue is overruled.

*Appellant's Batson Challenge*

In appellant's third issue, he argues that the trial court erred in overruling his *Batson* challenge that was made after the State used seven of its eleven peremptory challenges against veniremembers with Hispanic surnames. Appellant is Hispanic. In analyzing this issue, it is important to keep in mind that the holding in *Batson* was based on the Equal Protection Clause. Use of a peremptory challenge to strike a potential juror because of race violates the equal protection guarantee of the United States Constitution.

---

[3]Appellant's evidence included an announcement of his arrest in the Midland Reporter-Telegram dated December 31, 2008. However, it is not at all clear that the announcement was one of the top stories of the year. The mention of his arrest was very brief (three sentences) and non-prejudicial.

A defendant's *Batson* challenge is a three-step process. First, the defendant must make a prima facie showing of racial discrimination based on the prosecutor's conduct. If the defendant makes the prima facie showing, the burden shifts to the State to present a race-neutral reason for its challenged strike, a reason that is a clear and reasonably specific explanation of the legitimate reasons for exercising its strike. The defendant should then have the opportunity to rebut the State's explanation. *Simpson v. State*, 119 S.W.3d 262, 268 (Tex. Crim. App. 2003).

When reviewing a trial court's ruling on a *Batson* challenge, the appellate court applies a "clearly erroneous" standard. *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004); *Yarborough v. State*, 947 S.W.2d 892 (Tex. Crim. App. 1997). The standard is "highly deferential" to the trial judge. *Gibson*, 144 S.W.3d at 534. A ruling is clearly erroneous if, after a review of the entire record, the appellate court is left with the definite and firm conviction that a mistake has been committed. *Whitsey v. State*, 796 S.W.2d 707, 721 (Tex. Crim. App. 1989).

It is not clear that appellant made a prima facie showing of racial discrimination. The mere use of a strike against a Hispanic veniremember does not in and of itself establish a prima facie case of racial discrimination. *Aguilar v. State*, 826 S.W.2d 760, 763 (Tex. App.—Fort Worth 1992, pet. ref'd). Appellant's sole reason for his *Batson* challenge was that the State used seven of its eleven peremptory challenges on members with Hispanic names. The trial court asked the following of appellant:

> THE COURT: Which ones are you alleging that were made with not racially neutral reasons? I mean, there are a large portion of the jury panel is Hispanic, including some of your challenges for cause.
>
> [DEFENSE COUNSEL]: I would just have to leave it at that. I think we made a prima facie case.

Without more reasons and facts, this court cannot conclude that the State's conduct in this case excluded venirepersons from the jury on the basis of race. We note that eight of those with Hispanic names were challenged for cause by appellant and excused because they could not consider probation for aggravated assault or the low end of punishment. After all the challenges for cause, it appeared that forty-two potential jurors were left. Nevertheless, the State provided reasons for its peremptory challenges.

The State explained that it struck five of the seven potential jurors because they were single with young children and might have empathy for appellant's wife and two children. As to some of the five, the State gave additional reasons: Elizabeth Montoya did not respond well to

15

the State's questions, especially on punishment; Gina Vasquez did not finish high school; Ms. Zuniga indicated that she did not have weapons at her house or believe there is a right to bear arms, and she worked at the television station but did not remember much about the case; Kimberly Baeza's body language did not respond well to the State's questions, and the State had recently put an individual named Carlos Baeza in prison for intoxication manslaughter. The State explained that it struck Jose Villegas because he is single with young children at home. Because the State had struck single females with young children, the State felt it should also strike males who were in that situation.

The prosecutor explained that she struck Mr. Mireles because he would not look at her when she questioned him, because he said it would "depend" if he could give the minimum sentence, and because the State had prosecuted other defendants with the same last name. Appellant found that several other potential jurors (of both races) gave the same answer of "it depends." But appellant has now had time to search the record for details as opposed to the State's limited time to consult its notes concerning the jurors. Appellant argues that the State should have asked Mr. Mireles if any of his relatives had been prosecuted by the State. Again, the State's reason could have applied to anyone who had the same last name as defendants the State had prosecuted. We cannot say that reason was racially motivated even if the State was mistaken.

The State explained that Eric Mendez had stated that he did not know how to judge credibility when the State asked him what he would look for in a witness to determine whether they were telling the truth.

The State gave three reasons for striking Ms. Zuniga who worked as a news media assistant for a television station: (1) she did not believe that one should have the right to bear arms, (2) she was not believable when she said that she did not know much about the case, and (3) she was single with children. Appellant suggests that the State may have been confused concerning the first reason because Ms. Zuniga's answer came when defense counsel was asking each potential juror if he or she owned a firearm and did that member believe people should have the right to bear arms. After asking the double question numerous times, members of the panel began answering both questions without counsel repeating the two questions. As to the third reason, appellant argues that the State improperly relied on juror sheets.

The State gave reasons for its peremptory strikes that appeared to be race neutral. *See Grady v. State*, 730 S.W.2d 191 (Tex. App.—Dallas 1987), *vacated on other grounds*, 761

S.W.2d 19 (Tex. Crim. App. 1988); *Chambers v. State*, 724 S.W.2d 440, 442 (Tex. App.—Houston [14th Dist.] 1987, pet. ref'd). The challenge to single parents who might have sympathy for appellant's children could apply to single parents of any race. The process for assessing and judging credibility of a witness is key for any juror. Appellant did not request an opportunity to rebut the State's explanations. Unless the discriminatory intent is inherent in the State's explanations of its strikes, the reasons offered by the State will be deemed race neutral. *Guzman v. State*, 85 S.W.3d 242, 246 (Tex. Crim. App. 2002).

Appellant relies on *Greer v. State*, 310 S.W.3d 11 (Tex. App.—Dallas 2009, no pet.). But *Greer* is not helpful to our analysis. The *Greer* court first emphasized that the State used all of its peremptory strikes against African-Americans, who made up only 27% of the venire (8 out of 30 veniremembers). We are unable to tell by the record how many Hispanics were members of the much larger venire panel in this case. And the State in this case did not use all of its strikes against Hispanics; only seven of its eleven strikes were against Hispanics.

Another reason given by the *Greer* court in holding that the State's reasons were pretextual was that comparative juror analysis made the State's explanations for striking Juror No. 2 implausible. Juror No. 7 was very similar to Juror No. 2 except that she was white, yet the State did not strike Juror No. 7. In our case, appellant has not furnished us comparative juror analysis except for the answers relating to the minimum sentence. And by not requesting a rebuttal opportunity below, appellant deprived the trial court of any evidence or arguments that would have shown that the State's strikes were actually racially motivated. Appellant's third issue is overruled.

*Detective's Opinion on Appellant's Mental State*

In appellant's first issue, he argues that the trial court erred in allowing a police detective at two different times in the trial to express her opinion that appellant intentionally committed murder. The State first asked Detective Therwhanger why she obtained a murder warrant for the arrest of appellant. Detective Therwhanger replied as follows:

> Due to the investigation at the scene, the physical evidence in the car, the physical evidence at the scene, the witnesses, and what he had just told me, and how I learned what the scene looked like – I saw photographs. It was my opinion that he intentionally and knowingly shot his gun in the direction of at least four or five people, and hit one of them and killed him.

Later in the trial, Detective Therwanger was called for redirect and asked about some statements she made to appellant during the course of her interrogation of him:

Q. . . . I noticed when you took the statement from Mr. Saldana, you said several things in it like you knew he didn't mean to intentionally shoot someone, it might have been an accident or it might have been in self-defense. When you said all those things, do you believe all those things?

A. No, I do not.

Q. Well, why did you say that to him?

A. . . . Because it is an interrogation . . . [H]e was not being truthful in the very beginning . . . [I]t is a tactic in interrogations to . . . maybe get him to admit to something lesser than what it really is. It is just a way to get them to confess, if that's a good word to say.

Q. So by empathizing with the person you are interviewing, you kind of get them to relax . . . and give you more information?

A. In a way, yes. It is a way to give them an out, so to speak, to where if they don't want to admit to actually, intentionally shooting somebody, then maybe they will admit to it being an accident; because at that point he wasn't admitting to doing any of it.

Q. . . . So the mere fact that you said you thought he was remorseful, or you thought that this had been an accident or wasn't intentional . . . that's just interrogation techniques that you have been taught to utilize over the years, correct?

A. That's correct.

Q. Did you believe any of those things?

A. That it was accidental or nonintentional?

Q. Correct.

A. Absolutely not.

The standard for reviewing a trial court's decision to allow opinion testimony from a lay witness is abuse of discretion. It is well settled in Texas that no witness is competent to voice an opinion as to guilt or innocence. *Boyde v. State*, 513 S.W.2d 588, 590 (Tex. Crim. App. 1974). The intent of the defendant is a question of fact to be determined by the trier of fact from all the facts and circumstances of the evidence. *Hemphill v. State*, 505 S.W.2d 560 (Tex. Crim. App.

18

1974).  Texas courts have consistently reaffirmed the principle that the testimony of any witness regarding state of mind of another is pure speculation and, therefore, incompetent.  *Steve v. State*, 614 S.W.2d 137 (Tex. Crim. App. 1981).

The trial court erred in allowing the detective to give her opinion on appellant's mental state in response to the question of why she obtained a warrant.  Although a lay opinion that is an interpretation by the witness of his or her own objective perception of the events is normally allowed, Texas courts exclude a lay opinion that attempts to communicate the actual subjective mental state of an actor.  *Fairow v. State*, 943 S.W.2d 895 (Tex. Crim. App. 1997) (proper to exclude opinion of codefendant that the defendant "accidentally" shot the bar owner).

TEX. R. EVID. 701 allows a witness to give opinion or inference testimony provided that the opinion is rationally based on the perception of the witness and helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.  The *Fairow* court explained that the initial requirement that an opinion be rationally based on the perceptions of the witness is itself composed of two parts:  (1) the witness must establish personal knowledge of the events from which his or her opinion is drawn and (2) the opinion drawn must be rationally based on that knowledge.  *Fairow*, 943 S.W.2d at 898.

Detective Therwhanger was not present at the scene at the time of the incident.  She had no personal knowledge concerning the event and the veracity of any witness.  Although Detective Therwhanger testified that she reached her opinion based on the physical evidence in the car and at the scene, she could not have reached her conclusion without the hearsay statements of the witnesses to the event.  Lay-witness opinion based on hearsay is inadmissible. *McMillan v. State*, 754 S.W.2d 422, 425 (Tex. App.—Eastland 1988, pet. ref'd). Detective Therwanger's interpretation and opinion regarding the mental state of appellant were not an interpretation of her objective perception of events (i.e., her own senses or experience.). *Cf. Doyle v. State*, 875 S.W.2d 21 (Tex. App.—Tyler 1994, no pet.); *see Fairow*, 943 S.W.2d at 899.

The second exchange between the prosecutor and Detective Therwhanger is slightly more problematic.  Detective Therwhanger testified that she did not believe that the shots were fired accidentally or unintentionally to explain her own statements during the interrogation of appellant, which was played for the jury.  In the recording, Detective Therwhanger had suggested to appellant that he may not have intentionally shot someone, that it might have been an accident, or that it might have been in self-defense.  Detective Therwhanger's explanation was

19

that her statements were a tactic in interrogating appellant to try to obtain an admission by appellant concerning the shooting. If this had been the only exchange, the argument that Detective Therwhanger's answers were admissible might be persuasive. However, because this exchange followed the earlier answers of Detective Therwhanger, because of the emphasis in the prosecutor's questions concerning accidental versus intentional, and because the State was the proponent of this evidence, we hold that the trial court erred in overruling appellant's objection to the second time Detective Therwhanger testified that appellant's shots were intentional and not accidental.

Nonconstitutional errors require reversal only if the error affected appellant's substantial rights. TEX. R. APP. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in the determination of the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). An accused's substantial rights are not affected by the erroneous admission of evidence if the court, after examining the whole record, has fair assurance that the error did not influence the jury or had but slight effect. *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001).

In assessing the likelihood that the jury's decision was adversely affected by the error, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error, and how it might be considered in connection with other evidence in the case. *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). That is why we summarized the testimony and evidence in some detail at the beginning of this opinion.

The prosecution did not mention Detective Therwhanger's testimony in final argument. Instead, the prosecutor spent most of her time explaining the elements of murder, manslaughter, criminal negligence, and aggravated assault with a deadly weapon. The prosecutor discussed in detail the three ways the State could prove that appellant was guilty of murder The three methods were included in the counts of the indictment. *See* TEX. PENAL CODE ANN. §§ 19.01, 19.02 (Vernon 2003). The prosecution reminded the jury of the testimony of Russell and Heflin when appellant fired shots at them and reminded the jury to think about the testimony of Sikorski and Schwartz.

Russell testified that he saw appellant point his gun out the passenger side directly at them and pull the trigger. Before the shots, Russell heard appellant say, "What are you looking at?" Russell thought that appellant fired six shots at them. Heflin also said that he looked over

and saw a man inside the car pointing a gun at them through the passenger side; he was looking at them when appellant fired the shots. The evidence found by the police inside appellant's car – such as the spent shell casings – supported the testimony of Russell and Heflin. The forensic evidence supported their story that appellant intentionally and knowingly fired at them or in their direction. In his testimony, appellant admitted that he fired the shots, but he believed that he was firing in the direction of Sikorski or Schwartz, who testified that they were inside the Whataburger.

In *De La Paz v. State*, 279 S.W.3d 336 (Tex. Crim. App. 2009), Justice Cochran discussed the "doctrine of chances" and quoted the following example from 2 JOHN WIGMORE, EVIDENCE § 302 at 241 (Chadbourn rev. 1979):

[I]f A while hunting with B hears the bullet from B's gun whistling past his head, he is willing to accept B's bad aim . . . as a conceivable explanation; but if shortly afterwards the same thing happens again, and if on the third occasion A receives B's bullet in his body, the immediate inference (i.e., as a probability, perhaps not a certainty) is that B shot at A deliberately; because the chances of an inadvertent shooting on three successive similar occasions are extremely small. 279 S.W.3d at 347. That example is applicable to this case. After Schwartz saw that appellant had a gun, he walked away and then heard a gunshot behind him. Sikorski testified that he saw the gun go off, felt something whiz by him, and saw the bullet hit the pickup by him. While inside the Whataburger, they heard more gunshots.

Tuck saw sparks from a gun held by appellant while standing by the Ford Taurus. After appellant got in and backed up the Taurus, she heard four more shots and saw the victim fall and the Ford Taurus drive away. Mrs. Adams testified that, while her husband and the two other men were at the back of the pickup talking, she saw a car about to drive away and saw a girl in the car with dark glasses facing her. She heard four or five popping sounds and saw all three men go down.

Appellant testified that he felt threatened by Schwartz and Sikorski and that one of them came up to the passenger side of his car as he was leaving. All of the other witnesses testified that they saw no one confront or threaten appellant. From the testimony of Russell, Heflin, and Mrs. Adams, it is clear that no one was approaching the passenger side of appellant's car. The odds are high that appellant intentionally and knowingly shot at Adams, Russell, and Heflin, probably because he mistakenly took one or two of them for Schwartz or Sikorski. According to

Russell, appellant challenged them with "What are you looking at?" before firing several shots at them.

Detective Therwhanger stated what was obvious to the jury from all the testimony. This was not an accidental or unintentional shooting. Setting aside the testimony of Detective Therwhanger, there was compelling evidence of appellant's guilt. After reviewing the entire record, we find that the error did not influence the jury or had but a slight effect. *See Solomon*, 49 S.W.3d at 365. Appellant's first issue is overruled.

*Testimony of Possible Gang Membership*

In appellant's fourth issue, he argues that the trial court erred in refusing to grant his motion for mistrial after Detective Therwhanger mentioned possible gang membership. After voir dire, the State had agreed that it would not offer evidence of gang membership during the State's case on guilt/innocence. The trial court ordered the State to approach before mentioning a gang membership or affiliation.

As noted in the background facts, the State asked Detective Therwhanger if the red stitching on appellant's clothing had any significance. Detective Therwhanger replied that "it was very flashy clothing. It could be associated with a gang." The State had not asked to approach the bench before asking the question. The trial court sustained defense counsel's objection but overruled his motion for mistrial. The trial court instructed the jury to disregard the statement. Photographs of appellant's clothing were admitted over appellant's objection.

Appellant acknowledges that a mistrial is an extreme remedy for prejudicial events that occur during the trial. *Bauder v. State*, 921 S.W.2d 696, 698 (Tex. Crim. App. 1996). A mistrial is used to halt proceedings when the error is so prejudicial that expenditure of further time and expense would be wasteful and futile. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999).

Gang affiliation or the possibility thereof had nothing to do with the charges in this case. *See Galvez v. State*, 962 S.W.2d 203 (Tex. App.—Austin 1998, pet. ref'd); *Macias v. State*, 959 S.W.2d 332 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd). The statement by Detective Therwhanger was prejudicial, and there was no reason for the State to ask the question. The issue, however, is whether the trial court erred in overruling appellant's motion for mistrial. The denial of a mistrial is reviewed under an abuse of discretion standard. *Trevino v. State*, 991 S.W.2d 849, 851 (Tex. Crim. App. 1999).

We believe that any harm due to the testimony was cured by the trial court's instruction to disregard. The reference was brief and only to possible gang membership, and neither the

22

State nor its witnesses mentioned the subject again. Relevant evidence was overwhelming in support of appellant's conviction. The court noted in *Gardner v. State*, 730 S.W.2d 675, 696 (Tex. Crim. App. 1987), that, in the vast majority of cases in which testimony comes in, deliberately or inadvertently, that has no relevance to any material issue in the case and carries with it the potential for prejudice to the accused, the court presumes that the instruction to disregard will be obeyed by the jury. The trial court did not abuse its discretion in overruling appellant's motion for mistrial. Appellant's fourth issue is overruled.

*This Court's Ruling*

The judgment of the trial court is affirmed.


TERRY McCALL

March 10, 2011                                    JUSTICE

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.